## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-01755-RM-KAS

DAI HOANG, M.D.,
      Plaintiff,
  v.

DENIS McDONOUGH, Secretary,
Department of Veterans Affairs,
      Defendant.

---

## PLAINTIFF/PETITIONER'S OPENING BRIEF

---

Plaintiff Dai Hoang, by and through her undersigned counsel, hereby submits this brief in support of Plaintiff's claims for reversal and remand as set forth herein.

## STATEMENT OF MATERIAL FACTS

1.    This action arises under the Administrative Procedure Act (APA), 5 U.S.C. § 701, et seq. *See* Complaint [#1] at ¶ 1; Answer #97 at ¶1 (admitted).

2.    On August 30, 2005, the patient underwent a three-vessel coronary artery bypass (CABG) performed by attending surgeon Dr. Frederick Grover. *See* Complaint [#1], at ¶ 14; Answer [#97] at ¶14 (admitted); Administrative Record [#99-2] at SAR 0530-0533. Other members of the surgical team included surgeon Dr. Sunil Maholtra and assistant Dr. Trevor Oren. Administrative Record [#99-2] at SAR 0530-0533. Immediately after the surgery, VA surgeon Dr. Frederick Grover and the surgical staff discovered after the surgery that the last instrument count showed a missing Serafin

(metal) clamp but did not inform the patient of that at any time before he was discharged from the Denver VA. *See* Administrative Record [#99-2] at SAR 0536, 0540; Complaint [#1], at ¶ 14; Answer [#97] at ¶14 (admitted).

3.      After the surgery, numerous VA radiologists obtained and read x-rays over several months, including the following. *See* Administrative Record [#98-2] at SAR 0217-0229.

a.      Dr. William Stark reported on a single portable x-ray requested by Dr. Trevor Oren on August 30, 2005 at 11:26am and taken at 3:46pm. Administrative Record [#99-1] at SAR 0226-0227. In his April 4, 2013 statement to the OMLA Review Panel, Dr. Stark stated that "[the] postoperative patient was on life-support, and could not be safely transported to the Imaging Department for a formal exam in which the patient stands upright and posterior-anterior and lateral views are obtained with full patient cooperation. No lateral view was requested or obtained." Administrative Record [#98-2] at AR 0056-0057. He further noted that "[t]he history and exam request were entirely routine for this operation. The clinical history provided to the radiologist by the requesting clinician is a critical element in the radiologist's interpretation of the exam. In this exam, no mention was made of suspected retained instruments or of any other extraordinary consideration. It should be noted that it is especially important that all relevant clinical concerns be mentioned in the exam request for a portable bedside study in which the quality of the image is limited." *Id.* He further explained that, because the patient was

on life support, the x-ray technician has "limited time to obtain the x-ray" and
"the patient's position cannot be changed by the technician, and multiple
overlying and intrathoracic lines, hardware and support devices often cannot be
moved out of the way by the technician. On this exam there were sternal wire
ligatures, surgical clips, external monitoring leads and clips, a Swan-Ganz
intrapulmonary artery catheter, an endotracheal tube, external oxygen supply
mechanism, and mediastinal drains." *Id.*

b.    Plaintiff reported on a single portable x-ray requested by Dr.
Frederick Grover on August 30, 2005 at 1:38pm and taken at 1:52pm.
Administrative Record [#99-1] at SAR 0227-0228. Plaintiff's radiology report,
in pertinent part, provided that "[a] dense ribbon-like radiopaque object overlies
the right upper lobe." *Id.* As noted by OMLA Review Panel member Dr. Tatum
Johnson, "[i]nterestingly, this was not the retained foreign body that was found
on subsequent imaging [i.e., the metal clamp]." Administrative Record [#98-2]
at AR 0074.

c.    Dr. Rondle Moubry reported on a single portable x-ray requested
by Dr. Traci Kimball on August 30, 2005 at 8:54pm and taken at 8:57pm.
Administrative Record [#99-1] at SAR 0228-0229. In his April 15, 2013
statement to the OMLA Review Panel, Dr. Moubry stated that a lateral view
was not obtained or requested. Administrative Record [#98-2] at AR0048-0049.
He further stated that portable examinations, like the one he obtained, "by
nature are done utilizing mobile equipment and are not performed under

optimal conditions. Many times, with all sorts of catheters, tubing and monitor leads (which contain clips) in place. These are not removed by the technologist because they are critical for the monitoring and care of the patient. All of these devices cause difficulty to the radiologist interpreting the x-ray at hand." *Id.* He further noted that "[t]here was no indication that there was concern for a retained surgical instrument. This is critically important as the radiologist focuses on specific issues that are raised by the reason for the exam." *Id.* He recalled the presence of a left chest tube, right Swan Ganz Catheter that projected over the left and right sides of the chest, and several EKG leads that contained clips and projected over the left and right sides of the chest. *Id.* He opined that, "[t]he surgical clip must have been present at the time of the radiograph but could not be distinguished from the EKG clips because of the suboptimal quality of the radiograph inherent to the portable nature of the study." *Id.*

        d.      Dr. Elliot Sandberg reported on a single portable x-ray requested by Dr. Trevor Oren on August 31, 2005 at 7:21am. Administrative Record [#98-2] at SAR 0223-0224. In his April 4, 2013 statement to the OMLA Review Panel, Dr. Sandberg stated that the chest ray obtained was "a portable bedside anterior/posterior (AP) study; an imaging examination obtained at the bed side because the patient's clinical status remained too tenuous for transportation to the Imaging Service." Administrative Record [#98-2] at AR0046-0047. He further stated that "[n]o mention was made regarding any retained

instrumentation. The clinical history as provided on the formal imaging request as input by referring staff is a critical element supporting the Radiologist's focus on specified issues." *Id.* He recalled the presence of that "[n]umerous electrodes [that] were lying on the skin surface of the patient obscuring underlying lung and mediastinal detail. A chest tube was also in place." *Id.* He opined that "[t]he the surgical instrument must have been present at the time of the x-ray but could not reasonably be distinguished as such because of the overlying catheters and other superimposed articles on the skin surface which are generally present on these 'portable' bedside studies." *Id.*

e.    Plaintiff reported on a single portable x-ray requested by Dr. Trevor Orden on September 1, 2005 at 7:04am. Administrative Record [#99-1] at SAR 0225-0226. The "dense ribbon-like radiopaque object" did not appear on the film and, and therefore was not noted in the report. *Id.*

f.    On September 1, 2005 at 2:30pm, Dr. Trevor Oren requested chest series x-ray with 2 views of the chest – PA (posteroanterior, i.e., front) and lateral, however, Dr. Martin Sabatinos reported on a single portable x-ray. Administrative Record [#99-1] at SAR 0224-0225. In his May 22, 2013 statement to the OMLA Review Panel, Dr. Sabatinos stated that "[t]he history provided to me on the x-ray requisition states 'chest tubes D/C'd". There is no mention of a missing Serafin clamp on the request for the study I interpreted. In fact, retrospective review of each and every post-operative CXR request on this patient during his hospital admission for coronary artery bypass surgery

(CABG), reveals that no mention was ever made of a missing Serafin clamp. Administrative Record [#98-2] at AR 0050-0052. He further noted that "[t]here is no note in the patient's medical record (CPRS} documenting that the surgeon telephoned the radiologist at the time of the surgery with concern for a missing Serafin clamp." *Id.* regarding the x-ray he interpreted, he stated that "a two view exam [i.e., PA and lateral views] was ordered but only one view was obtained and submitted. In my experience, it is not unusual for the requesting physician or staff taking care of the patient to change the request from a two view exam (obtained in the radiology department) to a one view study (obtained on the patient floor using a portable x-ray machine), depending on the patient's clinical condition." *Id.*

g.      Dr. Paul Russ reported on a chest series x-ray requested by Dr. Trevor Orden on September 12, 2005 at 10:14am. Administrative Record [#99-1] at SAR 0223. Dr. Russ's report mentioned a metallic density: "Metallic density projects with the midline on the frontal film and posterior to the heart on the lateral examination. On the frontal film, this was present on previous portable examinations. There is mild density behind the body of the sternum. This may represent postoperative change. If infection is of concern, recommend further evaluation" *Id.* Dr. Russ was not reported to the NPDB, Complaint [#1], at ¶ 32; Answer [#97] at ¶ 32 (admitted), and the record does not contain a statement from him regarding this patient.

h.      Dr. Sandberg reported on an abdomen series x-ray with 3 or more views, which included erect frontal chest, abdomen, and pelvis views, requested by Dr. Cynthia Gaminde on September 16, 2005 at 6:05pm. Administrative Record [#98-2] at SAR 0223. Dr. Sandberg's report does not mention a metal clamp nor a retained foreign body. *Id.*

i.      Several months later, following a report from Dr. Michael Brantley at the Denver ER Emergency Room that the patient had retained a metal clamp, Dr. Moubry reported on CT scans of the chest without IV contrast requested by Dr. Jess Schultz on April 19, 2006 at 8:46am. Administrative Record [#99-1] at SAR 0217-0218. This was the first report from a VA radiologist that referenced a clamp.

4.      On or about August 29, 2007, the patient filed a Federal Tort Claims Act (FTCA) claim (SF-95) against the Denver VA. *See* Administrative Record [#98-2] at AR 0003-0004.

5.      On April 15, 2008, the patient filed a FTCA lawsuit in Federal District Court in Colorado, *Keller v. United States Department of Veterans Affairs*, Case No. 08-cv-00761-WYD-KLM (the FTCA case). On September 20, 2010, the presiding Federal Judge issued Proposed Findings of Facts and Conclusion of Law against the Denver VA. *See* Case No. 08-cv-00761-WYD-KLM, Doc. # 214. Plaintiff was not mentioned by the Judge directly or indirectly in either the Proposed Findings or Judgment. *See id.*

6.      A settlement and final payment in the amount of $131,416.03 was paid on January 14, 2011 for a judgment or settlement entered on September 20, 2010 in

the Adjudicative Body Case Number GCL42737, Court File Number, 08CV761, i.e.,
the FTCA case. *See id.*

7.     Following the FTCA judgment, the Office of Regional Counsel sent
notice of payment on the FTCA claim to the Director of the Denver VAMC. *See*
Administrative Record [#98-2] at AR 0001-0002. A report was then made to OMLA
after the conclusion of the FTCA claim. *See* Complaint [#1] at ¶ 16; Answer [#97], at
¶16 (admitted).

8.     On December 27, 2011 Denver VA Medical Center Director Lynette
Roff sent a letter to Plaintiff stating that Plaintiff was identified as a participant in the
care of a veteran patient at the Denver VA in August of 2005. *See* Administrative
Record [#98-2] at AR 0022-0023. This was the first notice Plaintiff received relating
the patient's FTCA claim or any related litigation matters or issues. She was never
requested to testify or provide any evidence at any stage of the investigation of the
patient's FTCA claims, during the subsequent lawsuit, or while the FTCA case was
pending.

9.  VHA Directive 2009-032 provides:

> It is VHA policy that each facility Director provide written notification to all
> licensed practitioners when a claim for medical malpractice is filed with respect
> to care provided by that practitioner; such notification must be provided within
> 30 days from the date a Regional Counsel notifies the facility Director that a
> claim for medical malpractice has been filed under the Federal Tort Claims Act
> (FTCA), Title 28 United States Code (U.S.C.) 1346(b), 2671-2680.

10.     Director Roff's December 27, 2011 letter further stated that the Plaintiff
had one opportunity to provide a written statement to the Director and comment on

her involvement in the patient's care within sixty (60) days of her receipt of the letter. The letter also stated that the request for a statement did not imply blame or fault, but an opportunity to submit information for consideration for the review panel at the Denver VA. *Id.* The letter also stated that Plaintiff and her authorized representative could review the patient's medical records and the Tort Claim Information System forms and form SD-95 that instituted the tort claim. *Id.* She was told that she could arrange to see these files by contacting Risk Manager Ronald Wilkins. *Id.* She was also told that her statement was the only way to provide information to the review panel considering her involvement in the care of the patient. *Id.*

11.    On April 17, 2012, Plaintiff responded to the OMLA inquiry and submitted it to Director Roff by hand delivery. Administrative Record [#98-2] at AR 0041-0045. In her response, Plaintiff explained that the retained clamp was simply not identifiable by anyone in the x-ray film that she reviewed. *Id.* She also discussed the history provided on the requisition of the patient (i.e., that there was no mention regarding any retained instrumentation in the physician's request and she was not directed to look for a missing or retained clamp), and the quality of the patient's August 30, 2005 radiograph. *Id.* She explained that the patient was on the surgery table and only a portable technique could be used, and many tubes, lines, sutures and other objects adversely affected the film's clarity. *Id.* She could not obtain a lateral view because the patient was on the surgery table and could not be positioned to take such a view. *Id.* She also renewed her request to appear in person before the OMLA Review Panel. *Id.*

12.    On December 9, 2014 Dr. Grippi, on behalf of the OMLA Review Panel, sent a memorandum to Director Roff stating that the four-member panel's conclusions required reporting Plaintiff to the NPDB. Administrative Record [#98-2] at AR 0041-0045. The four panel members were Dr. Norbert Kuberka, Dr. Joseph Ralabate, Dr. Tatum Johnson, and Dr. Dale Mueller. *Id.* The Review Panel determined that when she interpreted the single chest view x-ray performed on August 30, 2005, she should have communicated with the Cardiothoracic team to identify a problem and should have requested more imagining. *Id.* The Panel further provided its rationale:

> <u>Panel Conclusion and Rationale</u>: Based on a review of the medical record as well as any additional information submitted by practitioners involved in this case, the panel, which included a board certified Cardiothoracic Surgeon and a board certified Radiologist, determined that the standard of care was not met. The panel noted that the failure of the attending Cardiothoracic Surgeon to specifically document (in the operative report) the missing Serafin clamp as well as performance of a methodical wound exploration prior to or after identification of an incorrect count, was not appropriate. The panel also determined that the Radiologist (Dr. Hoag) (sic) who interpreted the single view chest x-ray performed at 13:52 on 30 August 2010 should have communicated more effectively with the Cardiothoracic team to identify the problem and should have recognized the opacity in the right apex of the lung as a possible sponge, and requested additional imaging. The panel noted that while this finding did not prove to be retained foreign body, at least 2 views are required to confirm or exclude the presence of a foreign body and a lateral chest x-ray performed at this time would have revealed both that the sponge was outside the patient, as well as the presence of the Serafin clamp. The first 2 view chest x-ray performed after the surgery was on 12 September 2010 and does reveal the Serafin clamp posterior to the heart. The panel therefore concluded that this patient had a delay in diagnosis of the retained foreign body which constituted substandard care, and identified Dai Hoang, MD and   [Dr. Frederick Grover]  , as the responsible practitioners.
>
> A copy of the Panel's conclusions should be made available to the involved practitioner(s).

The required report should be submitted to the NPDB, and a copy forwarded to this office, within 30 days of receipt of this memorandum. The NPDB will send a copy of the submitted report to the practitioner(s) with limited comment period in which to make changes or append comments. If you have any questions, do not hesitate to call me at 716-862-8521.

13.    By memorandum dated December 11, 2014, Director Roff communicated the conclusions of the OMLA Review Panel. *See* Administrative Record [#103], at AR 0095-0096. The memorandum stated, in pertinent part:

A review panel, which included a board certified Cardiothoracic Surgeon and a board certified Radiologist, convened to review the tort claim of the aforementioned Veteran. Based upon a review of the medical record, as well as any additional information submitted by practitioners involved in the case, the panel determined that the standard of care was not met. The panel determined that when you interpreted the single view chest x-ray performed at 13:52 on August 30, 2005, you should have communicated more effectively with the Cardiothoracic team to identify a problem, and should have recognized the opacity in the right apex of the lung as a possible sponge and requested additional imaging. The panel noted that while this finding did not prove to be a retained foreign body, at least 2 views are required to confirm or exclude the presence of a foreign body; a lateral chest x-ray performed at this time would have revealed both that the sponge was outside the patient, as well as the presence of the Serafin clamp. The first 2 view chest x-ray performed after the surgery was on September 12, 2005, and does reveal the Serafin clamp posterior to the heart. The panel therefore concluded that this patient had a delay in diagnosis of the retained foreign body which constituted substandard care and identified you as a responsible practitioner.

*Id.* The letter further indicated that a reporting would be made with the NPDB. *Id.*

14.    On August 6, 2015, The NPDB issued a "Medical Malpractice" report on August 6, 2015. The report stated that the basis for the Initial Action was "Surgical or other Foreign Body Retained". *See* Complaint [#1] at ¶ 51; Answer [#97] at ¶51

(admitted). According to this report, it was authorized to be used by the Colorado Medical Board. *Id.*

15. After Plaintiff disputed the NPDB report, the Department of Health and Human Services (HHS) denied the Plaintiff's request for dispute resolution on August 22, 2016. *See* Exhibit A.[1]

## STANDARD OF REVIEW

Under the APA, courts "shall ... hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A) (cleaned up). "To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) (citations omitted). It is this Court's task to determine whether Defendant exercised reasoned decision making, whether it considered the relevant factors, and whether the facts have some basis in the record. *Simpkins v. Shalala*, 999 F. Supp. 106, 110–11 (D.D.C. 1998) (citing *National Treasury Employees Union v. Horner*, 854 F.2d 490, 498 (D.C.Cir.1988)). As the Supreme Court held in *Overton Park*, "the generally applicable standards of § 706 require the reviewing court to engage in a substantial inquiry." 401 U.S. at 415.

---

[1] There is no indication that Defendant has challenged the court's subject matter jurisdiction over Plaintiff's APA claim or moved to dismiss for lack thereof. This exhibit is merely being submitted to demonstrate that the court has jurisdiction.

While the APA does not require an agency to have made the best decision, it does require the agency to have made a rational and justified one. The agency must have examined the relevant data and articulated a rational connection between the facts found and the decision made, supported by substantial evidence in the record. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983); *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1575–76 (10th Cir.1994). This includes a "thorough, probing, in-depth review" of the administrative record. *Ron Peterson Firearms, LLC v. Jones*, 760 F.3d 1147, 1162 (10th Cir. 2014) (internal quotation marks omitted).

## ARGUMENT

I.    <u>DEFENDANT'S ACTIONS IN REPORTING HER TO THE OMLA AND, SUBSEQENTLY, TO THE NPDB WERE ARBITRARY CAPRICIOUS.</u>

### A. The OMLA Review Panel failed to consider whether Plaintiff was told about the missing clamp.

Firstly, there is no indication that the OMLA Review Panel considered whether Plaintiff was told about the missing clamp. While the panel notes "the failure of the attending Cardiothoracic Surgeon [Dr. Grover] to specifically document (in the operative report) the missing Serafin clamp," there is no mention of whether Dr. Grover communicated with Plaintiff or any other radiologist about the missing clamp. Administrative Record [#98-2] at AR 0082-0083. Nor was there any consideration of whether Plaintiff knew there was a missing clamp. *See id.*

13

It is the cardiothoracic surgeon's responsibility and universal standard medical practice to adequately inform the radiologist with all relevant and pertinent information about the patient's medical condition. With the clinical knowledge obtained from the instrument count at the end of surgery, a cardiothoracic surgeon can go on a more directed search of the retained cardiac clamp on any portable chest x-ray, because he knows exactly what it looks like, how it may be positioned, where in the pericardial cavity each of the six Serafin clamps were deployed during the surgery, and how it might appear on a portable chest x-ray. Dr. Grover and the surgical team, therefore, had by far the best opportunity to locate the retained clamp on the portable chest x-rays. By concealing the knowledge of a retained or missing cardiac claim from the radiologists and the patient, Dr. Grover's conduct broke the chain of causation between Plaintiff's actions and the patient's injury.

It should be noted that Dr. Grover was the requesting physician for the single portable x-ray reviewed by Plaintiff on August 30, 2005. The Nursing intra-operative note on the surgery states: "LAST INSTRUMENT COUNT SHOWS MISSING ONE SERAFIN OF SIX.  STAFF EXHAUSTED SEARCH OF FIELD, ROOM, FLOOR. XRAYS TAKEN, DR.S MALHOTRA AND GROVER READ XRAYS AND DID NOT FIND SERAFIN. PENDING RADIOLOGIST READING." *See* Administrative Record [#99-2] at SAR 0536, 0540. As noted by Dr. Sabatinos, this was the only mention of a missing Serafin clamp in the medical record between the date of admission on August 30, 2005 and the date of discharge on September 4, 2005.

Administrative Record [#99-1] at SAR 0224-0225. This highly suggests that (1) Dr. Grover and the surgical team were aware of the missing clamp at the time he requested the single portable x-ray reviewed by Plaintiff, (2) Dr. Grover and Dr. Malhotra read the same x-rays interpreted and reported on by Plaintiff, and (3) they failed to mention the missing Serafin clamp in any request for radiological imaging. Furthermore, as the requesting physician, Dr. Grover received the very same information regarding the opacity (surgical sponge) identified by Plaintiff when she submitted her report. The Review Panel failed to articulate any rational basis for concluding that, had Plaintiff called Dr. Grover, he would have obtained any additional information that would have helped him locate the missing clamp that he (but not Plaintiff) knew was missing.

Whether Plaintiff was told about the missing clamp is a relevant factor in determining whether Plaintiff was a responsible practitioner, because, by not transferring the knowledge of the nature, size, shape, material, and possible location of the missing clamp to the radiologists for the portable chest x-rays, Dr. Grover and the surgical team seriously handicapped the radiologist's attempt to interpret the image. This is especially true given the poor quality inherent in a portable film, the limitation of having only a frontal view, and the impossibility of obtaining a lateral view, as discussed below.

Had the Review Panel considered lack of knowledge of the missing clamp along with Dr. Grover's and the surgical team's awareness of the missing claim, it should have concluded that the ongoing failure of Dr. Grover to communicate about the

missing clamp was a superseding cause of the delay in diagnosis of the retained body, that the patient's injury was unforeseeable to Plaintiff, and that Plaintiff's conduct was not the proximate cause of the injury. As such, Defendant failed to articulate a rational connection between Plaintiff's lack of knowledge and its conclusion that Plaintiff was a responsible practitioner who provided substandard care by delaying diagnosis of the retained clamp.

### B. The OMLA Review Panel failed to consider whether a lateral chest x-ray could have been performed at the time.

Secondly, there is no indication that the OMLA Review Panel considered whether a lateral chest x-ray could be performed. The Nursing intra-operative note indicates that the operation ended at 3:00pm on August 30, 2005. *See* Administrative Record [#99-2] at SAR 0537. As the Panel notes, Plaintiff interpreted the single view chest x-ray performed at 1:52pm on August 30, 2005. Administrative Record [#98-2] at AR 0082. In other words, the patient was still in the OR on the operating table at the time. The Panel states that Plaintiff "should … have obtained additional imaging" and that "a lateral chest x-ray performed at this time would have revealed both that the sponge was outside the patient, as well as the presence of the Serafin clamp," but there is no indication they considered whether the additional imaging they suggest was possible at that time.

Simply put, the Panel's conclusion that Plaintiff should have requested additional imaging in the form of a lateral-view x-ray is simply unsupported by the record, and the Panel fails to provide any reasoned explanation for how a lateral view

could have been obtained at that time. As Plaintiff explained in her response to the OMLA inquiry, she could not obtain a lateral view because the patient was on the surgery table and could not be positioned to take such a view. Administrative Record [#98-2] at AR 0041-0045. In other words, only portable chest x-rays can be obtained in the recent post-operative period, because patients are not able to stand in the erect position upon immediate completion of surgery and in days after surgery. A portable x-ray machine must be wheeled to the patient and the portable frontal chest x-ray is taken as the patient lies supine in bed. Portable chest x-rays are the only option in the recent post-operative period, since these patients are weak, bed-ridden and unable to stand for a standard frontal and lateral chest x-ray with a stationary x-ray machine following surgery. A portable x-ray machine can only produce a portable frontal chest x-ray image – it cannot obtain lateral views. Plaintiff's explanation for why the lateral view could not be obtained is supported by the statements of Dr. Stark and Dr. Sabatinos. Administrative Record [#98-2] at AR 0050-0052; Administrative Record [#99-1] at SAR 0226-0227.

The Panel also failed to consider the fact that a chest series x-ray with 2 views of the chest – PA (posteroanterior, i.e., front) and lateral were requested just two days later, Indeed, on September 1, 2005 at 2:30pm, Dr. Trevor Oren requested chest series x-ray with 2 views of the chest – PA (posteroanterior, i.e., front) and lateral, however, Dr. Sabatinos reported on a single portable x-ray. Administrative Record [#99-1] at SAR 0224-0225. As explained by Dr. Sabatinos, "a two view exam [i.e., PA and lateral

views] was ordered but only one view was obtained and submitted. In my experience, it is not unusual for the requesting physician or staff taking care of the patient to change the request from a two view exam (obtained in the radiology department) to a one view study (obtained on the patient floor using a portable x-ray machine), depending on the patient's clinical condition." Administrative Record [#98-2] at AR 0050-0052. Similarly, Dr. Stark, who read a single portable x-ray taken about two hours after Plaintiff's interpretation on August 30, 2005 further explained that, because the patient was on life support, the x-ray technician has "limited time to obtain the x-ray" and "the patient's position cannot be changed by the technician, and multiple overlying and intrathoracic lines, hardware and support devices often cannot be moved out of the way by the technician. On this exam there were sternal wire ligatures, surgical clips, external monitoring leads and clips, a Swan-Ganz intrapulmonary artery catheter, an endotracheal tube, external oxygen supply mechanism, and mediastinal drains." Administrative Record [#99-1] at SAR 0226-0227.

Whether a lateral chest x-ray could be performed is a relevant factor in determining whether Plaintiff was a responsible practitioner, because Plaintiff should not be held responsible for not doing what couldn't be accomplished. The notion that Plaintiff should have requested and obtained a lateral view that couldn't be obtained at the time and that was, in fact, requested by a member of the surgical team just two days later but still couldn't be obtained is nonsensical. As such, Defendant failed to articulate a rational connection between the patient's condition, whether a lateral chest

x-ray could be performed, the fact that a lateral view was requested but not obtained two days later, and its conclusion that Plaintiff was a responsible practitioner who provided substandard care by failing to obtain a lateral chest x-ray.

**C. The OMLA Review Panel failed to consider who reviewed the radiology reports.**

Finally, there is no indication that the OMLA Review Panel considered what was done with each radiologist report or who reviewed each radiologist report. Rather, the Review Panel assumed that, had Plaintiff called Dr. Grover regarding the identified opacity (surgical sponge) and requested additional imaging, it would have revealed the missing clamp. *See* Administrative Record [#103], at AR 0095-0096. There is no indication whether the Panel considered whether they had already obtained the information Plaintiff would have communicated through their review of the radiologist report. There is also no indication the Panel considered whether Dr. Grover learned the patient was not further informed about the possibility of retained clamp when Dr. Russ reported a metallic density on a chest series x-ray requested by Dr. Oren[2] on September 12, 2005, or why the clamp was only identified by an outside, non-VA facility only as a function of a screening protocol for an MRI over 6 months later in March 2006.

---

[2] It should be noted that, at the time, Dr. Oren was a surgical resident in the Cardiothoracic Surgery Service and, while he was involved in the care of the patient, he was always under direct supervision and took no independent action. *See* Administrative Record [98-2], at AR 0034. He was also listed as a member (surgical assistant) of the surgical team for this patient. Administrative Record [#99-2] at SAR 0530-0533.

This information is a relevant factor in determining whether Plaintiff was a responsible practitioner, because it would explain what caused the delay in identifying the metallic density and informing the patient of the retained clamp. As mentioned above, the Nursing intra-operative note on the patient's surgery suggests that Dr. Grover and Dr. Malhotra read the same x-rays interpreted and reported on by Plaintiff on August 30, 2005. *See* Administrative Record [#99-1] at SAR 0224-0225. As noted in Plaintiff's Motion to Supplement the Record [#118], Defendant's counsel indicated that the primary VA medical-records system, CPRS records an audit trail that records information regarding who accessed certain records but that the Review Panel did not review any audit trails. Therefore, the information is not a part of the administrative record, but it would have provided the panel with a definitive answer for whether Dr. Grover and the surgical team were already aware of Plaintiff's radiology report identifying the opacity (surgical sponge). It would have also provided the panel with information relevant to the delay in patient care.

As another example, the record shows Dr. Russ reported on a chest series x-ray requested by Dr. Trevor Orden on September 12, 2005 at 10:14am. Administrative Record [#99-1] at SAR 0223. Dr. Russ's report mentioned a metallic density. *Id.* There is no information in the record, however, as to why the patient was informed until the foreign body (metallic density) was identified by an outside, non-VA facility only as a function of a screening protocol for an MRI over 6 months later in March 2006.

Defendant did not consider this information when determining the practitioners responsible for the delay in patient care. As such, Defendant failed to engage in reasoned decision making based on relevant factors.

**CONCLUSION**

For the above reasons, Defendant failed to engage in the analysis required by law as it did not engage in "reasoned decision making based on relevant factors." *Simpkins* 999 F. Supp. at 110–11. Defendant's failure to consider the relevant factors constitutes an abuse of discretion and its decision to report Plaintiff as a responsible practitioner is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. Plaintiff respectfully requests this court reverse and remand Defendant's decision with directions to consider the relevant factors discussed above.

Date: May 17, 2024                                    Respectfully submitted,

*/s/   Joseph D. Magri*
Joseph D. Magri
Merkle & Magri, P.A.
5601 Mariner Street, Suite 400
Tampa, Florida 33609
Telephone: (813) 281-9000
Facsimile: (813) 281-2223
Email: jmagri@merklemagri.com
Attorney for Plaintiff

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 17, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a notification of such filing to the following:

Timothy.Jafek@usdoj.gov

CC:   Dai Hoang, M.D.
      daihoang@hotmail.com

                                        */s/   Joseph D. Magri*
                                        Joseph D. Magri